2021 IL App (2d) 190813-U
No. 2-19-0813
Order filed July 6, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-2231 |
| JERRY R. MILLER, | ) ) | Honorable David P. Kliment, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices McLaren and Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's concurrent terms of 30 years' imprisonment for two burglaries were the maximum for the Class X sentencing range, but the sentences were not an abuse of discretion given defendant's lengthy criminal history and his high risk for reoffending.

¶ 2    Defendant, Jerry R. Miller, entered open guilty pleas to two counts of burglary (720 ILCS 5/19-1(a) (West 2018)), which were Class 2 felonies carrying mandatory Class X sentencing based on defendant's criminal history (730 ILCS 5/5-4.5-95(b) (West 2018)). The trial court sentenced defendant to concurrent 30-year prison sentences. On appeal, defendant contends that the

sentences, which are the statutory maximum (*id.* 5-4.5-25 (West 2018)), are excessive because they are manifestly disproportionate to the nature of the offenses. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On November 15, 2018, defendant was charged with two counts of burglary (720 ILCS 5/19-1(a) (West 2018)), each alleged to have occurred on November 14, 2018. Count I alleged that defendant knowingly entered La Quinta De Los Reys (La Quinta) with the intent to commit a theft. Count II alleged that defendant knowingly entered Aurora Pancake House (APH) with the intent to commit a theft.

¶ 5     On January 18, 2019, defendant entered an open plea of guilty on each count. Defendant was informed of the charges against him and advised that, due to his criminal history, he would be sentenced as a Class X offender. The factual basis for the plea on count I established that, on November 14, 2018, Jesus Sanchez, the owner of La Quinta, reported to the police that an individual was breaking into La Quinta. Sanchez saw defendant enter the window on the side of the building and confronted him. Defendant swung a metal object at Sanchez and fled on foot. Officers arrived on the scene and observed defendant running away. Defendant was taken into custody. Review of the surveillance video showed that defendant had forced his way into La Quinta through a window and opened the cash register, which was empty.

¶ 6     The factual basis for the plea on count II established that, on the morning of November 14, 2018, an officer was dispatched to APH for a report of a burglary. When Jesus Belmonte arrived at APH for work at 5:30 a.m. that day, he observed a shattered window on the building. Belmonte reviewed the surveillance video, which showed defendant smash a window and enter the building at 2:15 a.m. Defendant went into the cash register and took $1700 in cash, along with employee

paychecks. Defendant admitted to smashing the window at APH, entering without permission, and taking an envelope with cash. The court accepted the pleas and continued the cause for sentencing.

¶ 7       The presentencing investigation report (PSI) included a 10-page typed statement prepared by defendant. Defendant described his troubled childhood. His mother was an alcoholic who had passed out drunk while his older brother played with matches. Their house burned down, and defendant was found in his crib with burns to his body. Defendant was removed from his mother's custody and placed in a youth home and multiple abusive foster homes. Defendant also described his personal relationships, which included two marriages and divorces. He had a daughter who was born in 2001; he last saw her in 2007 when she visited him in prison. Defendant detailed his medical conditions, specifically his "spinal problems," stating that "permanent peralysis [*sic*] is upcoming." Defendant stated that he was "very impacted" by the robberies and "remorseful." He also stated: "I deserve what this Honorable Court passes down in punishment to the extent the Court deems proper, and if the Honorable Court doesn't think I will have a chance in making it in society, I can't find or be helped by cousselings [*sic*], field services and/or outside organizations, then a maximum sentence on counts be imposed upon me."

¶ 8       The PSI also set out defendant's criminal history. In 1978, defendant was convicted of car tampering and sentenced to one year in jail and two years' probation. That same year, he was also convicted of burglary and sentenced to four years' probation. In 1980, defendant was convicted of murder and armed robbery and sentenced to concurrent prison terms of 40 years and 25 years, respectively. In June 1999, defendant was released on mandatory supervised release (MSR). In September 2002, defendant was convicted of burglary and sentenced to four years in prison. Defendant was released on MSR in November 2003. In March 2005, defendant was returned to prison for a parole violation and subsequently discharged in July 2005. Defendant committed

burglaries on October 1, 2005, October 29, 2005, and November 4, 2005. In 2006, he was convicted of the 2005 burglaries and sentenced to concurrent 25-year prison terms. He was released on MSR on May 4, 2018. Just over six months later, defendant committed the present offenses.

¶ 9    The PSI indicated that defendant was at high risk for engaging in future criminal conduct. The investigative officer noted, in particular, defendant's criminal history. The officer further noted that defendant (1) "has difficulty navigating life on the outside of an institution," (2) "has never truly known any type of family support," and (3) "admitted that when times have gotten difficult for him and he is not able to find a solution, he has resorted to burglaries." The officer stated that defendant broke into La Quinta and APH to go back to prison and that defendant expected to receive the lowest possible sentence.

¶ 10    A sentencing hearing took place on March 8 and 14, 2019. The State presented four witnesses in aggravation. Sanchez testified that, at about 11:30 a.m. on November 14, 2018, he was notified by his alarm company of a break-in at La Quinta. He looked out the window of his residence, which was above La Quinta, and saw defendant enter the patio area behind La Quinta, approach a window, and start banging on it. Sanchez ran downstairs and entered La Quinta. He saw defendant. His body was halfway through a broken window. His arms were inside the building and his feet were outside. Sanchez screamed and approached defendant. From about three to four-and-a-half feet away, defendant swung at Sanchez with a metal object that was a few inches long and then ran away through the patio doors. Sanchez followed defendant, saw police officers, and pointed toward defendant. Defendant was apprehended. Sanchez watched surveillance video with the officers, which showed defendant enter La Quinta through a window, open the cash register, which was empty, and then go toward the office in the basement. Nothing was taken from the

office. Defendant was wearing a black shirt, gray hoodie, gloves, and a covering over his mouth area.

¶ 11    Aurora police officer Shawn Fancsali testified that, at about 8:44 a.m. on November 14, 2018, he was dispatched to APH in response to a burglary. He reviewed surveillance video, which showed defendant wearing "some type of black scarving around his face." Fancsali saw defendant rummaging through drawers and the cash register and enter an office. Fancsali was advised that $1700 and some employee paychecks were missing from the office. Later that day, at around 11:22 p.m., Fancsali responded to a burglary call at La Quinta. He saw defendant, who had been apprehended, and immediately noticed that defendant was wearing the same clothing as the person Fancsali had seen in the surveillance video at APH earlier that day.

¶ 12    Aurora police detective Ronald Miller testified that he interviewed defendant on November 15, 2018. Defendant admitted to committing the burglaries. Defendant told Miller that he gained entry to APH by throwing a brick through the window and that he took money and employee checks from the office. Defendant told him that he threw the checks into a dumpster, which had been emptied before his arrest, and spent the money. Defendant gained entry to La Quinta by breaking a window. Defendant checked the cash register and attempted to enter an office but was scared off by the owner. Defendant did not take anything from La Quinta. Defendant told Miller that, while he was "wandering around doing his exercises *** he kind of got bored, and it was a past thing that he had done before and reverted back to old habits." Defendant told Miller that "he couldn't control himself." When Miller was asked whether defendant indicated "if anything would stop him," Miller responded: "If he was locked up."

¶ 13    Aurora police officer Katelyn Groom testified that she was dispatched to La Quinta in response to a burglary and pursued defendant as he ran from the scene. Defendant obeyed her

command to stop and she handcuffed him. A search of defendant revealed a hat and a small flashlight. Defendant told her that he was trying to get something to eat through an open window at La Quinta but that a man chased him away.

¶ 14    Defendant presented two witnesses in mitigation. Lester Armstrong, a parole officer with the Department of Corrections (DOC), testified that he supervised defendant for six months prior to his arrest, while defendant was living at Wayside Cross Ministries. Defendant was "likeable," "decent," "always positive," and compliant with probation rules. Armstrong was not aware of any drug or alcohol use by defendant. Armstrong was "shocked" and "disappointed" when he learned of defendant's arrest because defendant was "two days away from moving to a place *** that might be better for him." Defendant had "numerous doctors' appointments" and "had some skeletal issues with back or spine or legs." Defendant walked with a cane on occasion.

¶ 15    Defendant testified that, on the date of the offenses, he lived at the Oasis Center, a "discipleship house for people that actually graduate from Wayside Cross Ministries," but his lease was up. Defendant was not in good health and had been on disability since April 2018. He suffered from a degenerative spine, asthma, heart disease, sleep apnea, and numerous other health conditions. Defendant testified regarding the many different medications he took and the treatments he received. Defendant testified that doctors have told him that he will likely be paralyzed within a couple of years. Defendant has had difficulty finding housing due to his health issues. He needed to live at an assisted living facility or nursing home, but he did not meet the age requirements or was disqualified due to his criminal history. Defendant did not want to go back to prison, but he felt that he had no alternative. Defendant testified that he committed the burglaries with the intent of returning to prison so that he could work on his "situations and [he would] have some tools that [he] learned when [he] was out." He further stated, "plus, they would help me—

they would have to help me—they're obligated to help me find a place to go." Defendant testified that, when he entered APH, he moved the surveillance camera and looked into it to make sure that he was seen. Similarly, when he entered La Quinta, he saw the surveillance camera and walked right past it. Defendant ran from Sanchez because Sanchez was hollering at him and defendant was scared. Defendant was able to move quickly because he "wasn't feeling too much pain with the injections [he gets]." At the time of the burglaries, defendant was able to exercise and could walk. He had a walker but did not have it with him. At the time of sentencing, he was using a walker. Defendant was in a lot of pain, which had gotten worse because he was not getting his injections or physical therapy. When asked about his life goals, defendant stated that he was not going to give up. Defendant stated that he had a daughter who was in a "bad situation" and he wanted to help and support her. He testified that he wanted to "get back out and be in a rest home or a nursing home." He thought that he "still could do some type of work" and that he was "very skilled in a lot of areas." Defendant wanted to "get back into the discipleship area" and help others.

¶ 16    On cross-examination, defendant admitted that, while inside APH, he did not remove the covering over his mouth when he moved the surveillance camera to be seen. He admitted that, in addition to the face cover, he was wearing a cap and gloves. Defendant denied swinging a metal object at Sanchez. Defendant ran as fast as he could when Sanchez was chasing him. When the police apprehended him, he did not admit to the burglaries; he told them instead that he wanted to get some food and that he only reached into the window. Defendant admitted to the burglary at APH after the police showed him his picture from the surveillance video. Defendant testified that he has had many of his medical issues since at least 2006.

¶ 17    In allocution, defendant stated that he had been misled by the DOC. He stated that they were supposed to take care of his medical issues. Defendant tried to find a place to live where he

was going to feel at home. Defendant stated that "the worst part of it all is that [he] hurt his daughter." Defendant was "also hurt a lot because [he] really thought that [he] was actually going to be able to go to a place that sound[ed] so promising" and be able to get help. Defendant "was turned down for the wrong reasons that they stated." Defendant did not know if he was "fit for society anymore." He stated: "I know that I'm not the only one in this situation that had made a bad choice that I felt that was for the right reason, for me to go in and get some help and to have them be able to help me come back out in society."

¶ 18     In sentencing defendant, the trial court stated as follows. The court considered the PSI and read defendant's 10-page written statement "several times." The court also considered defendant's statement in allocution. The court considered the factual basis of the pleas and the testimony of the officers regarding the offense. The court addressed the financial impact of incarceration, noting the 2016 average annual cost of $26,331, and stated that defendant's incarceration "might cost significantly more than that given his myriad of health needs." The court considered all the factors in aggravation and mitigation. Regarding mitigation, the court found that defendant's conduct did not cause or threaten serious physical harm to another (730 ILCS 5/5-5-3.1(a)(1) (West 2018)) and that defendant did not contemplate that it would (*id.* § 5-5-3.1(a)(2)). The court rejected defendant's argument that he acted under a strong provocation (his medical needs and inability to find housing) (*id.* § 5-5-3.1(a)(3)) and that there were substantial grounds tending to excuse or justify his conduct (defendant's rationale for committing the burglaries) (*id.* § 5-5-3.1(a)(4)). The court also rejected defendant's argument that his criminal conduct was the result of circumstances unlikely to occur (*id.* § 5-5-3.1(a)(8)). The court reasoned that, while defendant testified that he had most of his medical conditions since at least 2006, they did not stop him from committing the crimes in 2018. The court did find that imprisonment would endanger defendant's medical

conditions (*id.* § 5-5-3.1(a)(12)) but also noted that imprisonment might allow him to get the medical care that he needed. In aggravation, the court found that defendant had a history of criminal activity (*id.* § 5-5-3.2(a)(3)). The court found that the need for deterrence was also an applicable factor (*id.* § 5-5-3.2(a)(7)), as was the fact that defendant was convicted of a felony while on MSR (*id.* § 5-5-3.2(a)(12)).

¶ 19    The trial court commented on defendant's written statement and his testimony. The court acknowledged that defendant has "had a really horrible life" and that defendant had "spent most of [his] life in and out of institutions." The court further stated:

> "But what I think happened on the day of these burglaries is, you went out to commit
>
> burglaries. I don't think you were considering your physical condition or the fact that you
>
> might want to go back to prison so that you can turn 62 while you're in prison and get the
>
> services you need when you get out. I think you just wanted to commit some burglaries.
>
> Whether or not you can control yourself or not, I don't know; but, certainly, on that day,
>
> you could not."

The court found that defendant's testimony that he wanted to get caught was belied by the fact that he covered his head and face and wore gloves. The court commented that if defendant just wanted to get caught, he would have committed a single burglary. Instead, defendant committed a second burglary and ran from the police until there was a fairly large police presence around him. The court commented that defendant had people who were trying to help him, specifically noting Armstrong's testimony that he was "disappointed" when he heard that defendant was arrested, because defendant had been doing so well. The court stated that defendant was "a little bit of a con man." The court acknowledged defendant's physical issues but did not believe they were as bad as defendant claimed because "[defendant] seem[ed], at least on the days [*sic*] of November 14th

of 2018, to be getting around okay, and I don't think you should ever get out of prison again." The court stated:

"Something you said in your statement, I am very impacted by these—I'm sorry— I am very impacted by these offenses I committed against the owners of these commercial businesses. I am remorseful. I wish I could take back time and never have done this. I let down my daughter, my friends, my parole officer, my church congregation, pastors, mentors, and associates. I deserve what this Honorable Court passes down in punishment to the extent deemed proper. And if the Honorable Court doesn't think I will have a chance in making it in society, I can't find or be helped by counseling, field services, and/or outside organizations, that a maximum sentence on all counts be imposed on me.

And I don't think that you can live in our society anymore. I don't think you are capable of it. So as much as I hate to do it, for the protection of society and in considering all of the things in your criminal history, your actions on the date of November 14th, I am going to sentence you to a period of 30 years in the [DOC] to be followed by a three-year period of [MSR]."

¶ 20    On April 12, 2019, defendant filed a motion to reconsider his sentence, arguing that it was excessive in light of the nonviolent nature of the offenses, defendant's criminal history, family history, economic status, level of education, and personal habits. Defendant pointed to his age, health, and the high cost of incarceration. Defendant argued that the sentence was not in keeping with the alternatives available to restore him to useful citizenship.

¶ 21    The trial court denied the motion, stating that the sentence was justified and reasonable under the circumstances. The court noted that it considered defendant's health situation, which defendant had described "in great detail," and that it was well aware of the financial cost to be

borne by the State of Illinois. Nevertheless, the court emphasized that it also considered defendant's criminal history, which was "as bad as any [it had] seen." The court noted that defendant was on parole when he committed the offense. The court stated: "I recall saying when I sentenced him that I did not want him on the streets. I thought he was a danger to society. I thought that he was incapable of conforming to the law, and I think his criminal history proved that. And I still believe that." The court also stated: "I don't guess at what the length of [defendant's] life is going to be. Any sentence to the [DOC] is a life sentence potentially for anybody who goes, no matter the length."

¶ 22    Defendant timely appealed.

¶ 23                                    II. ANALYSIS

¶ 24    On appeal, defendant asserts that his "30-year sentence is manifestly disproportionate to the nature of the case given the fact that he did not harm anyone, was sixty years old, had such serious health issues that he was going to be paralyzed in a few years, and committed the offenses so that he could receive medical treatment." He asks that, under Illinois Supreme Court 615(b)(4) (eff. Jan. 1, 1967), we reduce his sentence to a lesser term or remand for a new sentencing hearing.

¶ 25    Rule 615(b)(4) grants a reviewing court the power to reduce a sentence. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). "That power, however, should be exercised cautiously and sparingly." (Internal quotations omitted.) *Id.* "A reviewing court may not alter a defendant's sentence absent an abuse of discretion." *Id.* The trial court has broad discretion in imposing a sentence, and its sentencing decisions are entitled to great deference. *Id.* Sentences within the permissible statutory range may be deemed an abuse of discretion only where they are "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 210 (2000)). It is the trial court's responsibility

"to balance relevant factors and make a reasoned decision as to the appropriate punishment in each case." *People v. Latona*, 184 Ill.2d 260, 272 (1998). The trial court has a far better opportunity to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *Alexander*, 239 Ill. 2d at 213. " 'A sentence must be based on the particular circumstances of each case and depends on many factors, including the defendant's criminal history *** and the need to protect the public and provide a deterrent to crime.' " *People v. McGee*, 2020 IL App (2d) 180998, ¶ 8, (quoting *People v. Jones*, 2019 IL App (1st) 170478, ¶ 49). The reviewing court must not substitute its judgment for that of the trial court merely because it would have weighed the sentencing factors differently. *Alexander*, 239 Ill. 2d at 213.

¶ 26    Defendant contends that the trial court's 30-year sentence was an abuse of discretion because it was grossly disproportionate to the nonviolent nature of the offense. In support, he relies on *People v. Busse*, 2016 IL App (1st) 142941, and *People v. Allen*, 2017 IL App (1st) 151540, cases in which the defendants were subject to Class X sentencing for nonviolent offenses and the First District found that their sentences were excessive. Defendant argues that, like the defendants in *Busse* and *Allen*, he did not harm anyone or cause significant property damage.

¶ 27    In *Busse*, the defendant had stolen $44 in quarters from a vending machine and was convicted of burglary. *Busse*, 2016 IL App (1st) 142941, ¶ 1. Because of his prior convictions, he was sentenced as a Class X offender and subject to a sentence of 6 to 30 years in prison. *Id.* ¶ 26. The court sentenced him to 12 years in prison, specifically noting his criminal history. *Id.* ¶ 17. On appeal, a divided panel of the First District reduced the defendant's sentence to the minimum six-year prison term. *Id.* ¶ 38. The court held that the sentence imposed by the trial court was disproportionate to the petty nature of the offense. *Id.* ¶ 34-37. The court stated: "We feel confident

that the legislature created Class X sentencing to protect the public from murderers and rapists, not penny-ante pilferage." *Id.* ¶ 31. Justice Mason dissented, declining to join the majority's "decision to substitute their judgment for that of the circuit court." *Id.* ¶ 40 (Mason, J., dissenting).

¶ 28    In *Allen*, the defendant had broken the window of a parked truck and taken a hat and two packs of cigarettes. *Allen*, 2017 IL App (1st) 151540, ¶ 4. He was convicted of burglary. *Id.* Because of his prior convictions, he was sentenced as a Class X offender and subject to a sentence of 6 to 30 years in prison. *Id.* ¶ 11. The court sentenced him to 10½ years in prison. ¶ 7. On appeal, a divided panel of the First District, relying on its earlier decision in *Busse* (*id.* ¶¶ 12-14), held that the sentence did not reflect the low level of seriousness of the offense, and thus reduced the sentence to the minimum prison term of six years. *Id.* ¶ 15. Justice Mason again dissented. Referring to *Busse*, she stated: "This is the second time in recent memory that this court has carved out a 'petty offense' exception to legislatively-mandated Class X sentencing in order to reverse a sentence over the six-year minimum." *Id.* ¶ 33. (Mason, J., dissenting). She continued:

> "But the reasoning in *Busse* and here simply ignores that the legislature included all types of Class 1 and Class 2 felony convictions for purposes of a defendant's eligibility for mandatory Class X sentencing. Had the legislature meant to exempt nonviolent felonies, 'petty' felonies, or any other type of felony from mandated Class X sentencing, it would have said so." *Id.*

Mason further stated: "The majority's willingness to override discretionary sentencing decisions based on its supposition that the legislature did not really mean what it plainly said does not reflect the cautious and sparing use of the power of a reviewing court to reduce a sentence." *Id.*

¶ 29    First, we note that neither *Busse* nor *Allen* supports defendant here, as they were decided on their particular facts and circumstances. See *People v. Fern*, 189 Ill. 2d 48, 55 (1999)

(comparing sentences in different cases not favored); see also *People v. Cunningham*, 2018 IL App (4th) 150395, ¶ 55 (rejecting a comparative application of *Busse* and *Allen*). Thus, we reject any comparison between defendant's sentences and those in *Busse* and *Allen.*

¶ 30    Moreover, we note that *Allen* has been rejected by the Fourth District in *Cunningham* and, more recently, by this court in *McGee*. In *Cunningham*, the defendant, who had an extensive criminal history, entered a garage without permission and with the intent to commit a theft but did not take anything. *Cunningham*, 2018 IL App (4th) 150395, ¶ 5. He pleaded guilty to burglary and was sentenced as a Class X offender to 20 years in prison. *Id.* ¶ 1. Relying on *Allen*, the defendant argued on appeal that his sentence was excessive because his crime was less serious than that in *Allen. Id.* ¶ 52. The Fourth District declined to apply *Allen*. Instead, it agreed with Justice Mason's dissent. The court stated:

> "While defendant in this case argues his offense is not serious enough to receive a Class X punishment, we agree with Justice Mason that it is for the legislature to enact the laws, not this court. Here, we only determine if the trial court abused its discretion in sentencing defendant based on his criminal history and factors in aggravation and mitigation." *Id.* ¶ 54.

The court affirmed the 20-year prison sentence, finding that the record failed to show that the trial court abused its discretion when weighing the relevant aggravating and mitigating factors. *Id.* § 56.

¶ 31    In *McGee*, the defendant was convicted of retail theft of property worth less than $300 based on evidence that he had stolen shirts from Macy's. *McGee*, 2020 IL App (2d) 180998, ¶ 3. His criminal history made him eligible for an extended-term sentence of three to six years in prison. *Id.* In sentencing the defendant to a term of four years in prison, the trial court noted, *inter alia,* the defendant's extensive criminal history. *Id.* ¶ 5. On appeal, relying on *Allen*, defendant argued

that his sentence was excessive when measured against the seriousness of the offense, which would have been a misdemeanor but for his criminal history. *Id.* ¶ 9. Relying on both *Cunningham* and the dissent in *Allen*, we rejected the defendant's request to reduce his sentence. *Id.* ¶ 16. We stated:

"The *Allen* majority improperly substituted its own judgment of the seriousness of the offense for that of both the General Assembly and the trial court. The *Allen* majority thus invaded the 'legislative province to define offenses and determine the penalties required to protect the interests of our society.' [Citation.] The General Assembly's decision to sentence certain defendants as Class X offenders reflects a legislative judgment that their crimes, in conjunction with their criminal histories, are more serious offenses warranting a severe penalty." *Id.*

In affirming the defendant's sentence, we also emphasized that the *Allen* court ignored an obvious purpose of sentencing: "protecting the public from the defendant's depredations." *Id.* ¶ 17.

¶ 32    Here, defendant was convicted of two counts of burglary (720 ILCS 5/19-1(a) (West 2018)), which are normally Class 2 felonies carrying a sentencing range of three to seven years in prison (730 ILCS 5/5-4.5-35(a) (West 2018)). However, defendant was subject to mandatory Class X sentencing based on his criminal history (*id.* § 5-4.5-95(b)) and thus was eligible for a sentencing range of 6 to 30 years in prison (*id.* § 5-4.5-25(a)). The legislature has determined that defendant's offenses, despite their nonviolent nature, were serious enough in conjunction with his criminal history to warrant a sentence between 6 and 30 years in prison. As noted in *Cunningham*, "we only determine if the trial court abused its discretion in sentencing defendant based on his criminal history and factors in aggravation and mitigation." *Cunningham*, 2018 IL App (4th) 150395, ¶ 54. Upon reviewing the record, we hold that it did not.

¶ 33    In imposing the 30-year sentence, the trial court noted that it had considered all factors in aggravation and mitigation. In addition, the court considered the PSI, which included extensive information about defendant's personal history, medical conditions, and significant criminal history. The court also considered defendant's written statement and testimony, specifically noting that it read defendant's statement "several times." The court specifically acknowledged defendant's history, age, and medical conditions. The court considered the testimony at the hearing and the factual basis for each plea. The court was well aware of the facts and circumstances related to each offense.

¶ 34    The trial court expressly rejected defendant's claim that he committed the burglaries to get help, stating: "I think you just wanted to commit some burglaries. Whether or not you can control yourself or not, I don't know; but, certainly, on that day, you could not." The trial court's comments were clearly supported by the record. The court found that defendant's testimony that he wanted to get caught was belied by the fact that defendant covered his head and face and wore gloves and by the fact that, if defendant just wanted to get caught, he would have committed a single burglary. In addition, defendant fled from the scene and initially told an officer that he only reached into the window at La Quinta to try to take food. The court also commented that there were people, like Armstrong, who were trying to help defendant. The court stated that defendant was "a little bit of a con man." The court also commented that it did not believe that defendant's medical conditions were as bad as defendant claimed. The trial court heard defendant's testimony and statement in allocution and was able to make a reasoned judgment on defendant's credibility.

¶ 35    In aggravation, defendant had a significant criminal history, which included a murder conviction and numerous burglary convictions. He was convicted of a prior felony while on MSR. Defendant committed the current offenses just over six months after having been released on MSR

for his three 25-year concurrent prison sentences for burglary. The court also cited deterrence as an aggravating factor. The court rejected defendant's argument that the offenses occurred as a result of circumstances unlikely to reoccur. Indeed, the PSI indicated that defendant was at a high risk for engaging in future criminal conduct. Miller testified that defendant told him that he committed the robberies when he was "bored," that he "reverted back to old habits," that he "couldn't control himself," and that he would stop only "[i]f he was locked up." In imposing sentence, the court emphasized "the protection of society" and "all of the things in [defendant's] criminal history." In denying defendant's motion for reconsideration of his sentence, the court again emphasized defendant's criminal history, which, it stated, was "as bad as any [it had] seen." The court further stated: "I recall saying when I sentenced him that I did not want him on the streets. I thought he was a danger to society. I thought that he was incapable of conforming to the law, and I think his criminal history proved that. And I still believe that." The court's comments make clear that it found little to no rehabilitative potential.

¶ 36    To be sure, the trial court also found mitigating factors. The court found that defendant's conduct did not cause or threaten serious physical harm and that defendant did not contemplate that it would. The court was aware that defendant pleaded guilty. The court found that imprisonment would endanger defendant's medical conditions, although it also commented that imprisonment might allow defendant to get the medical care that he needed. The court was also well aware of the cost of incarceration, noting it might be higher due to defendant's medical issues. Defendant argues that, although the court recognized mitigating factors, it failed to give them adequate weight. However, "[t]he existence of mitigating factors does not mandate imposition of the minimum sentence [citation] or preclude imposition of the maximum sentence [citation]." *People v. Flores*, 404 Ill. App. 3d 155, 158 (2010); see also *People v. Payne*, 294 Ill. App. 3d 254,

260 (1998) ("The existence of mitigating factors does not obligate the trial court to reduce a sentence from the maximum sentence allowed.") The court was well within its discretion to determine that these mitigating factors were far outweighed by aggravating factors, in particular defendant's criminal history and the need to protect the public. This court may not reweigh the factors.

¶ 37 Although defendant's sentences were the maximum within the applicable sentencing range, the record shows that, in arriving at the sentence, the trial court thoughtfully and thoroughly considered and balanced all of the relevant factors before it. The court's emphasis on defendant's criminal history and the need to protect the public was well within the range of its discretion. Based on the foregoing, we cannot say that the 30-year sentence on each count is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Stacey*, 193 Ill. 2d at 210.

¶ 38                                  III. CONCLUSION

¶ 39 For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 40 Affirmed.